UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

Choonja Lee,

                    Plaintiff,

v.                                                          Civ. No. 03-3589 (JNE/SRN)
                                                            ORDER
Fortis Benefits Insurance Company,

                    Defendant.

---

Mark M. Nolan, Esq., and Jodell M. Galman, Esq., Nolan, MacGregor, Thompson & Leighton,
appeared for Plaintiff Choonja Lee.

Leigh M. Chiles, Esq., Baker, Donelson, Bearman, Caldwell & Berkowitz, PC, appeared for
Defendant Fortis Benefits Insurance Company.

---

Choonja Lee brought this action against Fortis Benefits Insurance Company (Fortis) to recover long-term disability (LTD) benefits under a plan offered by her employer, Nurse Anesthesia Services, P.A. (NASPA), pursuant to the Employee Retirement Income Security Act (ERISA), 29 U.S.C. §§ 1001-1461 (2000).  The case is before the Court on cross-motions for summary judgment.  For the reasons set forth below, the Court grants Fortis's motion and denies Lee's motion.

## I.    BACKGROUND

Lee is a Certified Registered Nurse Anesthetist.  In May 2000, at age fifty-nine, Lee was diagnosed with non-Hodgkin's lymphoma.   Shortly after diagnosis, Lee commenced chemotherapy, ceased working, and applied for benefits under a group plan of LTD insurance (Plan) offered by her employer, NASPA.   Under the terms of the Plan, Lee was entitled to benefits as long as she was disabled until she turned 65 years, 8 months.  The Plan defined "disabled" and "disability" in relevant part as follows:

Disabled or disability mean that in a particular month, you satisfy one or more of the . . . Tests, as described below.

Occupation Test

> during a period of disability (including the qualifying period), an injury, sickness, or pregnancy requires that you be under the regular care and attendance of a doctor, and prevents you from performing at least one of the material duties of your regular occupation.

Earnings Test

> You may be considered disabled in any month in which you are actually working, if an injury, sickness, or pregnancy, whether past or present, prevents you from earning more than 80% of your monthly pay in that month in any occupation for which your education, training, or experience qualifies you.  On each anniversary of the date your disability started, we will increase by 7.5% the monthly pay figure we use to decide whether you are disabled under this test.  This increase will not affect the amount of benefit we pay.

> If your actual earnings during any month are more than 80% of your monthly pay (including the 7.5% increase(s)), you will not be considered disabled under the Earnings Test during that month.  Salary, wages, partnership or proprietorship draw, commissions, bonuses, or similar pay, and any other income you receive or are entitled to receive will be included.  However, sick pay and salary continuance for periods not at work will not be included.  Any lump sum payment will be pro-rated, based on the time over which it accrued or the period for which it was paid.

> You may still be considered disabled according to the Occupation Test, without regard to your level of current earnings, if you meet the requirements of that Test.

The Plan defined "material duties" as "the sets of tasks or skills required generally by employers from those engaged in a particular occupation.  One material duty of your regular occupation is the ability to work for an employer on a full-time basis as defined in the policy."

Dr. Joseph Cardamone, Lee's primary treating physician, supported Lee's June 2000 application for benefits.  He represented to Fortis that Lee was severely physically impaired and incapable of even minimal (sedentary) activity.  On the basis of these representations, Fortis

granted Lee's request and began paying benefits on September 1, 2000, after Lee's qualifying period expired.  Lee underwent the last of four cycles of chemotherapy the same month.  Since late October 2000, her lymphoma has been in remission.

On March 2, 2001, a Fortis consulting physician, Dr. Andrew H. Teklinksi, reviewed Lee's attending physician statements of disability to determine whether Lee was entitled to continued benefits.  Dr. Teklinski concluded that there was no evidence to support the presence of permanent physical limitations as a result of Lee's lymphoma and, contrary to Dr. Cardamone's suggestion in his attending physician statements that Lee was immunosuppressed, "[w]ork as an anesthetist would not be expected to place [Lee] at an unreasonable risk of infection."

By letter of March 7, 2001, Fortis terminated Lee's benefits.  In the letter, Fortis informed Lee that a member of its clinical services staff had reviewed Lee's statements of disability and had determined that the side effects of chemotherapy typically do not limit individuals for more than seven to twenty-eight days after treatment and that the work environment of a nurse anesthetist would not pose an undue risk of infection for a patient with a low-grade lymphoma.  As a result, it had determined Lee was not disabled from her own occupation as of January 1, 2001.  As a courtesy, Fortis continued to pay benefits through March 7, 2001, while it was reviewing her records.

On April 16, 2001, Lee appealed Fortis's March 7 decision to terminate benefits.  Lee maintained she was unable to perform at least one of the material duties of her job as a nurse anesthetist because her lymphoma and chemotherapy rendered her immunosuppressed; there may be a link between lymphoma and exposure to anesthetic gases; and she suffers from fatigue, weakness, burning eyes, pain, and an inability to concentrate.  In support of her appeal, Lee

supplied Fortis a letter from Dr. Cardamone dated March 19, 2001; letters from colleagues attesting to her work ethic and the demands of her occupation; and several articles examining the carcinogenicity of anesthetic gases.  In his March 19 letter, Dr. Cardamone opined that Lee was immunosuppressed on the basis of her underlying disease process and that the immunosuppression was "complicated still further by the chemotherapeutic agent, fludarabine." He indicated that "[i]t is generally felt that the immune suppression from such chemotherapeutic agents is relatively long-lived, that is at least two-plus years before reconstitution might be expected in an individual with a normal immune system."  He also wrote that Lee suffered from fatigue and generalized achiness, which "can be relatively long-lived."  Finally, Dr. Cardamone addressed Lee's concern that anesthetic gases may cause a more rapid recurrence of the disease:

> [Lee] is concerned about the mutagenicity and potential carcinogenicity of the operating room chemicals and volatile anesthetics.  The evidence for mutagenicity or carcinogenicity of these agents is certainly not entirely clear, but certain studies do point to an increased incidence of sister chromatid exchanges in the lymphocytes of individual [sic] exposed to the volatile gases.  These sister chromatid exchanges may very well represent an initial nidus for mutations within those cells.

After consulting with Dr. William H. Lohman, a physician board-certified in internal medicine and occupational and preventative medicine, Fortis informed Lee in mid-June 2001 that it was affirming its decision to terminate benefits.  Fortis reasoned that Lee did not have any "definitive laboratory testing showing an actual disorder of [her] immune system" and her "medical records [were] unpersuasive that [she] [was] impaired or that [her] impairment prevent[ed] [her] from doing [her] own occupation."  With respect to Lee's claim that returning to work would likely cause a relapse or recurrence of her lymphoma because she would be exposed to anesthetic gasses, Fortis relayed:  "[T]here is no evidence that carcinogens can affect the prognosis of the cancer once it is established; they do not affect the response to treatment nor

the likelihood of relapse.  Furthermore, any risk of exposure to anesthetic gases is minimized by the use of properly maintained gas scavenging systems."  Finally, Fortis rejected Lee's claim that fatigue, weakness, burning eyes, and difficulty concentrating rendered her disabled within the meaning of the Plan.  According to Fortis, those are typical side effects of chemotherapy and they typically resolve within four to eight weeks after chemotherapy has been completed.  Fortis recognized that the symptoms could also be somatic manifestations of a mood disorder, but noted that Lee had not presented any evidence that she was being treated for such a disorder.

In accordance with Plan procedures, Lee appealed Fortis's decision for a second time on October 15, 2001.  Dr. Cardamone again submitted a letter on Lee's behalf to Fortis.  In his letter, dated August 23, 2001, Dr. Cardamone wrote:

> My patient, Choonja Lee, was back in the office today and brought her physician's review of her disability claim.  Apparently, Dr. Lohman's conclusions were that she was not immune suppressed, but was showing mild myelosuppression.  Her myelosuppression certainly continues and, if anything, has worsened slightly with a white blood count today of 3,200 versus 3,900, a platelet count of 92,000 versus 99,000, and an absolute granulocyte count of 1,900 versus 2,300.  Dr. Lohman is, I think, leaping to a conclusion when he says that she is not immune suppressed.  The four cycles of fludarabine in and of itself would suppress her enough to mention the underlying immune suppression from her follicular lymphoma.  In order to demonstrate specifically the lymphoid immune suppression, specific parameters would have to be undertaken such as her lymphocyte subpopulation counts and various stimulatory challenges.  From a clinical standpoint, this is more information that we usually need.  We know that lymphoma patients are immune suppressed from the disease, and we know that the fludarabine is highly immune suppressive in addition to its myelotoxicity.
>
> She apparently now feels that she would like to return to work on a part-time basis, and I felt that this is certainly something that she can undertake.  Although I think she is disabled to some degree from the effects of her disease and her treatment, I think she could go back to a part-time position.

In response, Fortis submitted Lee's records and Dr. Cardamone's letter to Dr. Lohman for a second review.  Dr. Lohman did not find Dr. Cardamone's letter persuasive.  He opined:

There continues to be opinion without foundation that Ms. Lee is immunosuppressed. However, Dr. Cardamone certainly does not feel that this precludes Ms. Lee's return to work since he is supportive of her returning part-time.

While Ms. Lee wishes to avoid a risk that she perceives from being exposed to anaesthetic gases, this does not mean that she is <u>disabled</u>.

There continues to be no objective medical evidence that Ms. Lee is otherwise limited by her physical condition. An FCE and/or IME could establish the objective parameters of her physical capacity.

At Dr. Lohman's recommendation, Fortis requested that Lee undergo a Functional Capacity Evaluation (FCE). The FCE revealed that, as of February 2002, Lee was capable of working eight hours per day in the medium classification of work, with a maximal lift of thirty pounds. Amy Langler, one of Fortis's vocational rehabilitation counselors, reviewed Lee's occupation and determined that, under the Department of Labor's Dictionary of Occupational Titles (DOT), "Nurse Anesthetist" falls within the light classification of work, regardless of whether the nurse anesthetist is administering local or general anesthetic.

Recognizing that Lee's physical abilities as of February 2002 did not definitively establish that Lee was capable of performing similar tasks when it terminated benefits in March 2001, Fortis also submitted Lee's medical records to Dr. Walter Longo, a specialist board-certified in oncology and internal medicine. Dr. Longo reviewed Lee's medical records on April 15, 2002, and again on June 28, 2002. Dr. Longo concurred with Fortis's conclusion that there is no direct relationship between the incidence of lymphoma and exposure to anesthetic gases. He also concurred with Fortis's opinion that Lee's immunosuppression/myelosupression would not have posed an unreasonable risk of infection to Lee. Dr. Longo concluded that Lee could have performed her occupation on a full-time basis as of March 7, 2001. However, he recommended

that she be given a two-week transition from twenty hours per week to forty hours per week, beginning March 7, 2001.

Finally, Fortis submitted Lee's medical records to Dr. Ellen Snoxell, a psychologist.  In a report dated June 14, 2002, Dr. Snoxell indicated that while Lee exhibited symptoms of depression, there was no evidence that her symptoms were sufficiently severe to prevent her from performing her occupation.

Consistent with Dr. Longo's recommendation of a transition period, Fortis remitted an additional payment for benefits to Lee for the period from March 7, 2001, to March 21, 2001.  In all other respects, Fortis affirmed its March 7, 2001, decision.  Lee filed this lawsuit on July 8, 2003.

## II.    DISCUSSION

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  The moving party "bears the initial responsibility of informing the district court of the basis for its motion," and must identify "those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  If the moving party satisfies its burden, Rule 56(e) requires the party opposing the motion to respond by submitting evidentiary materials that designate "specific facts showing that there is a genuine issue for trial."  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  In determining whether summary judgment is appropriate, a court must look at the record and any inferences to be drawn from it in the light most favorable to the party opposing the motion.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

A.    **Standard of Review**

A participant in an ERISA plan may bring suit "to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan." 29 U.S.C. § 1132(a)(1)(B).   Typically, a court reviews de novo a denial of benefits challenged under that section. *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989).   However, when a plan gives discretionary authority to the plan administrator or reviewing committee to determine eligibility for benefits or to construe the terms of the plan, a court reviews the decision to deny benefits for an abuse of discretion. *Id*. Here, the Plan provides that an insured "must furnish whatever items we decide are necessary as proof of loss or to decide our liability."  In addition, Fortis maintains—over Lee's objection— that the Plan was amended to contain the standard discretion-granting language commonly employed in LTD policies post-*Firestone*.  The alleged amendment provides:  "We have the sole discretionary authority to determine eligibility for participation or benefits and to interpret the terms of the Policy.  All determinations and interpretations made by us are conclusive and binding on all parties."

The Court first considers the original Plan language.  The parties agree that typical proof- of-loss provisions do not grant discretionary authority. *See, e.g., Walke v. Group Long Term Disability Ins.*, 256 F.3d 835, 839-40 (8th Cir. 2001) (holding policy did not confer discretion where administrator agreed to pay benefits if the insured "submits satisfactory proof of Total Disability to us"; reasoning that "to us" was "ambiguously located"); *Brown v. Seitz Foods, Inc. Disability Benefit Plan*, 140 F.3d 1198, 1200 (8th Cir. 1998) (holding policy contained typical proof-of-loss language and was therefore insufficient to confer discretion on plan administrator where policy provided that benefits would be paid upon receipt of "due written proof of loss");

*Ravenscraft v. Hy-Vee Employee Benefit Plan and Trust*, 85 F.3d 398, 402 n.2 (8th Cir. 1996) (noting policy contained typical proof-of-loss language and holding such language was not sufficient to confer discretion on plan administrator); *Bounds v. Bell Atl. Enters. Flexible Long-Term Disability Plan*, 32 F.3d 337, 339 (8th Cir. 1994) (holding provision wherein insurer agreed to pay benefits when it received "adequate proof of loss" was typical proof-of-loss provision and did not confer discretion on plan administrator). The parties, however, disagree about whether the original Plan language in this case is a typical proof-of-loss provision, or whether it more closely resembles language courts have deemed sufficient to confer discretion.

In determining whether a plan grants discretionary authority, "magic words (such as 'the committee has discretion to . . .') are unnecessary." *Sisters of the Third Order of St. Francis v. SwedishAmerican Group Health Benefit Trust*, 901 F.2d 1369, 1371 (7th Cir. 1990). The plan must, however, contain explicit discretion-granting language. *See Walke*, 256 F.3d at 839. As relayed above, in this case the Plan requires the insured to "furnish whatever items [Fortis] decides are necessary as proof of loss or to decide [its] liability." This Plan language clearly conveys that Fortis has discretion to determine what evidence is sufficient to establish its liability. Thus, the Court concludes that the original Plan language is sufficient to invoke the abuse-of-discretion standard of review.[1] *See Hildebrand v. Fortis Benefits Ins. Co.*, 70 Fed. Appx. 798, 800 (6th Cir. 2003) (noting it was "inclined to believe" identical language granted plan administrator discretionary authority); *Richter v. Fortis Benefits Ins. Co.*, 41 F. Supp. 2d

---

[1]      On March 1, 2004, the magistrate judge made a "preliminary determination about whether the discretionary standard [would] apply" in this case, noting that "[t]he standard of review to be applied in reviewing the claims administrator's decision is typically determined at the dispositive motion phase." The magistrate judge determined that the plan did not confer discretion and that the de novo standard of review would therefore apply. On May 17, 2004, the Court affirmed that Order. Upon further review of the case law, as discussed above, the Court concludes that the preliminary determination was contrary to law. The Court notes, however, that it would reach the same result in this case under the de novo standard of review.

866, 869 (S.D. Ill. 1998) (holding similar language clearly conferred discretion on the plan administrator); *cf. Ferrari v. Teachers Ins. & Annuity Ass'n*, 278 F.3d 801, 806 (8th Cir. 2002) (holding abuse-of-discretion standard applied where plan specified that employee was required to provide written proof of continued total disability at reasonable intervals to be determined by plan administrator and such proof had to be satisfactory to plan administrator). Having reached this conclusion, the Court need not reach the question of whether Fortis has timely submitted satisfactory proof that the Plan was amended to confer discretion.

When reviewing a plan administrator's decision for abuse of discretion, a court must uphold the decision if it was "reasonable" or supported by "substantial evidence." *McGee v. Reliance Standard Life Ins. Co.*, 360 F.3d 921, 924 (8th Cir. 2004). Substantial evidence is more than a scintilla but less than a preponderance. *Leonard v. Sw. Bell Corp. Disability Income Plan*, 341 F.3d 696, 701 (8th Cir. 2003). Based only on the evidence that was before the plan administrator at the time the decision was made, a court focuses on whether a "reasonable person *could* have reached a similar decision . . . not that a reasonable person *would* have reached that decision." *Phillips-Foster v. UNUM Life Ins. Co. of Am.*, 302 F.3d 785, 794 (8th Cir. 2002) (quotations omitted).

## B.    Merits

Fortis terminated Lee's benefits because it believed Lee was no longer disabled. According to Fortis, Lee's illness did not prevent her from performing any of the material duties of her job. Lee, on the other hand, maintains that she is disabled for three reasons: (1) she is immunosuppressed; (2) she suffers from severe pain, fatigue, and decreased concentration; and (3) there is a causal link between exposure to anesthetic gases and lymphoma. The Court will address each claim in turn.

1.      *Immunosuppression*

Lee first argues she is immunosuppressed and a return to her job as a nurse anesthetist will put her at an unacceptable risk of contracting opportunistic diseases to which nurse anesthetists are regularly exposed.  She asserts the risk is exacerbated by the fact that she is allergic to many sulfa-based antibiotics.

Fortis disputes Lee's contention that her supporting materials establish that she is immunosuppressed.  Fortis acknowledges that Lee suffers from myelosuppression as a result of the lymphoma and chemotherapy, but contends further testing is required to establish that she is immunosuppressed.  Moreover, Fortis argues that Lee has not presented evidence that her alleged immunosuppression is sufficiently severe to prevent her from working at her regular occupation.

Upon a review of the record, the Court concludes that Fortis could reasonably find that there was insufficient evidence in the record to establish that Lee was so severely immunosuppressed that she could not perform the material duties of a nurse anesthetist.  Fortis clearly indicated to Lee in its June 15, 2001, letter affirming its original decision that it required "definitive laboratory testing showing an actual disorder of [her] immune system."  Despite the fact that Lee's physician conceded such testing exists and the Plan informed Lee that it would not pay benefits if she did not furnish "required information," Lee did not provide Fortis with the laboratory test evidence it requested.  This failure is reason enough to uphold Fortis's decision. *See Pralutsky v. Metro. Life Ins. Co.*, 435 F.3d 833, 839 (8th Cir. 2006) (concluding plan administrator acted reasonably  in denying benefits where insured failed to provide requested objective evidence and where such evidence could have been obtained).

There are, however, additional bases for upholding Fortis's decision.   First, Fortis's reviewing physicians unequivocally concluded that if Lee took standard safety precautions, her risk of exposure to infection was no greater when she was working as a nurse anesthetist than when she was in the general public environment.   As Dr. Lohman noted in his December 5, 2001, report, there is no evidence in the record that Lee had suffered an increase in infections, opportunistic or otherwise, after diagnosis or treatment.   Nor is there any evidence that her treating physicians recommended that Lee take specific precautions to avoid infection, such as wearing a mask in public or taking prophylactic antibiotics.   Thus, the record supports the conclusion that Lee could take steps to protect herself from opportunistic disease while working as a nurse anesthetist.   Second, the Court notes that Lee's physician authorized her to return to work as a nurse anesthetist in August 2001, notwithstanding the fact that the results of her blood tests were worse in August than they had been in previous months.   Although he limited her to part-time work and only to local anesthesia cases, there is no suggestion in his records that those limitations were imposed to limit her exposure to opportunistic disease.   The fact that Dr. Cardamone would release Lee to work in her old environment strongly suggests that Lee was not so severely immunosuppressed that working as a nurse anesthetist would put her at an unacceptable risk of contracting opportunistic diseases.

In sum, there is substantial evidence in the record supporting Fortis's determination that Lee was not so severely immunosuppressed that she could not work as a nurse anesthetist.

2.      *Pain, fatigue, and decreased concentration*

Next, Lee argues that her pain, fatigue, and inability to concentrate impair her ability to perform several of the material duties of a nurse anesthetist.   Lee maintains that, according to her NASPA job description, her work requires that she be able to lift up to fifty pounds, which her

condition prevents her from doing.  Fortis, on the other hand, maintains that, as described in the Department of Labor DOT description of nurse anesthetist, lifting up to fifty pounds is not a requirement of Lee's occupation.   According to the DOT description, Lee's occupation is classified as a light occupation, requiring lifting of no more than twenty pounds at a time.  Fortis further argues that the February 2002 FCE establishes Lee was capable of working eight hours per day in the medium classification of work, with a maximal lift capacity of thirty pounds.

At the heart of the parties' dispute about Lee's ability to perform the physical requirements of her occupation is whether Fortis's use of the DOT description was reasonable notwithstanding the fact that Lee's particular job with NASPA requires greater physical strength and stamina than that depicted in the DOT description.  In a letter dated February 25, 2002, Fortis explained to Lee that it "view[s] an occupation as a group of jobs in which a common set of tasks is performed; or a group of jobs which are related in terms of similar objectives and methodologies, and which may be related in terms of material, products, worker actions, or worker characteristics."   Fortis specifically informed Lee that, when assessing whether an insured is disabled from his or her occupation, it "consider[s] only the duties that are material to the occupation, not all of the specific duties of a particular job with a particular employer."

A plan administrator's interpretation of plan language will be upheld if reasonable. *Finley v. Special Agents Mut. Benefit Ass'n*, 957 F.2d 617, 621 (8th Cir. 1992).   When determining whether an interpretation is reasonable, the Court considers whether the interpretation is consistent with the goals of the plan; whether the interpretation renders any language in the plan meaningless or internally inconsistent; whether the interpretation conflicts with the substantive or procedural requirements of ERISA; whether the plan administrator has

interpreted the provisions at issue consistently; and whether the interpretation is contrary to the clear language of the plan.  *Id.*

The most significant of the *Finley* factors is whether the decision is consistent with the language of the plan.  *Janssen v. Minneapolis Auto Dealers Benefit Fund*, No. 04-3463, 2004 WL 3019792, at *6 (D. Minn. Dec. 30, 2004) (citing *Lickteig v. Bus. Men's Assurance Co. of Am.*, 61 F.3d 579, 583-84 (8th Cir. 1995)).  The Court therefore looks first to the Plan language to determine whether Fortis's interpretation of "material duties of your regular occupation" is reasonable.  The Plan specifically defines "material duties" as "the sets of tasks or skills *required generally by employers* from those engaged in a particular occupation."  (Emphasis added.)  This definition unambiguously gives Fortis the authority to look beyond the requirements of a specific employer when determining the material duties of an insured's occupation:  it clearly advises Plan participants Fortis will consider the sets of tasks or skills required *generally by employers* with respect to that occupation.  Fortis's interpretation of "material duties of your regular occupation" is therefore consistent with the Plan language.  Lee does not suggest that the interpretation renders other language in the Plan meaningless or internally inconsistent, nor does she offer any evidence that this interpretation is inconsistent with the goals of the Plan, conflicts with the substantive or procedural requirements of ERISA, or is inconsistent with Fortis's prior interpretations of this term.  Thus, the Court concludes that Fortis's use of the DOT description was reasonable.  Furthermore, the February 2002 FCE results, Langler's vocational assessment, and the opinion of Dr. Longo provide substantial support for Fortis's conclusion that Lee could perform the physical material duties of her regular occupation, as that occupation is defined by the DOT description.

Lee also argues that her job description demonstrates that her material duties include intense concentration, complex problem solving, and ability to cope with stress; her pain, fatigue, and impaired concentration limit her ability to do these things. Fortis does not dispute that Lee may suffer to some extent from pain, fatigue, and impaired concentration, but rejects Lee's claim that they were sufficiently severe to prevent her from performing her job as a nurse anesthetist after March 21, 2001. All Fortis reviewing physicians who considered Lee's argument support Fortis's position. In particular, Dr. Snoxell, to whom Fortis submitted Lee's medical records for psychological review, concluded that Lee was not disabled by psychiatric symptoms. She wrote:

> Claimant's son notes numerous symptoms and describes his mother as dependent but her physicians do not report disabling psychiatric symptoms. Claimant's self-report on FCE and in phone conversation with Mr. Orjala suggest some depressive symptoms, but not to the degree that she is disabled by these symptoms. Both claimant and her son describe problems with concentration, but there is no objective evidence that her concentration is impaired. Claimant appears to be chiefly concerned that she not return to an environment she perceives as hazardous.

Dr. Snoxell's opinion is supported by Lee's own self-evaluation, which Lee completed in conjunction with the February 2002 FCE. In that evaluation, Lee noted that in the two weeks preceding the evaluation, she only had difficulty concentrating several days, not more than half of the days or nearly everyday. Moreover, later in the same evaluation, the questionnaire asked: "If you checked off any problems on this questionnaire so far, how difficult have these problems made it for you to do your work, take care of things at home, or get along with other people?" Given the choice of "not difficult at all," "somewhat difficult," "very difficult," and "extremely difficult," Lee checked "not difficult at all." Lee, in other words, did not herself view her symptoms as disabling as of February 2002. The Court recognizes this admission occurred almost one year after her benefits were initially terminated. Nevertheless, there is no suggestion in the record that her symptoms were more severe in March 2001. On the contrary, Dr.

Cardamone concluded in January 2001 that she suffered from *mild* depression/anxiety; a March 7, 2001, letter from oncologist Dr. Bruce A. Peterson to Dr. Cardamone reflected that, at that time, Lee was "feeling well."  In sum, there is substantial evidence in the record supporting Fortis's determination that Lee's pain, fatigue, and decreased concentration did not prevent her from performing any of the material duties of her regular occupation.

3.      *Exposure to anesthetic gases*

Finally, Lee argues that there is a causal link between exposure to anesthetic gases and lymphoma.  As a result, Lee insists that returning to her job as a nurse anesthetist would subject her to a significant risk of recurrence.[2]   Lee has offered a number of articles from the medical literature supporting her claim.  Fortis's reviewing physicians, however, all reject the theory that there is such a causal connection.  In fact, Lee's own physicians do not universally support Lee's theory.  For example, her physician at the Mayo Clinic, Dr. Ivana N. Micallef, indicated that she was not aware of any such connection.   Moreover, Lee's primary treating physician, Dr. Cardamone, acknowledged in his March 19, 2001, letter to Fortis that the evidence for mutagenicity or carcinogenicity of operating room chemicals and volatile anesthetics is "certainly not entirely clear."   In view of the conflicting opinions on this issue, Fortis's decision to reject Lee's claim of such a connection was not an abuse of discretion.  *Cf. Hunt v. Metro. Life Ins. Co.*, 425 F.3d 489, 491 (8th Cir. 2005) (concluding plan administrator did not abuse its discretion by denying benefits based on its reviewing physician's conclusions when reviewing physicians and insured's treating physicians disagreed about insured's degree of disability).

---

[2]      It is unclear from Lee's submissions whether she continues to rely on this argument in support of her claim for benefits.  At times, she seems to abandon the argument, while at other times she argues that Fortis's denial of the relationship is without basis and was therefore arbitrary.  For purposes of completeness, the Court has considered the argument.

C.      **Benefits Calculation**

Finally, Lee asserts that even if Fortis properly determined she was not entitled to benefits after March 21, 2001, Fortis underpaid her for the period of March 8-21, 2001. Under the terms of the Plan, Lee's schedule amount for disability payments was 60% of her pre-disability monthly pay. Lee maintains, however, that Fortis should have paid her 100% of her pre-disability wages for March 8-21. In support of her argument, she relies on language in a letter she received from Fortis in September 2000. The letter stated:

> As an added benefit for you as our insured, if you return to work part time, Fortis Benefits has a 100% Return to Work Provision. This provision would allow us to supplement part time employment for your earnings so that you will be receiving 100% of your pre-disability earnings for the first twelve months of your disability period. This is something to strongly consider during the recovery period. Instead of only getting 60% of your income for disability, you could earn up to 100% by returning to work part time.

This provision clearly applies only in circumstances where the insured has returned to work part-time. There is no dispute in this case that Lee had not yet returned to work in March 2001. Accordingly, Lee's reliance on this statement is misplaced, and the Court rejects the argument that Fortis underpaid her.

### III.    CONCLUSION

Based on the files, records, and proceedings herein, and for the reasons stated above, IT

IS ORDERED THAT:

1.      Fortis's Motion for Summary Judgment [Docket No. 44] is GRANTED.

2.      Lee's Motion for Summary Judgment [Docket No. 48] is DENIED.

3.      This case is DISMISSED WITH PREJUDICE.

LET JUDGMENT BE ENTERED ACCORDINGLY.

Dated: March 27, 2006

                                        s/ Joan N. Ericksen
                                        JOAN N. ERICKSEN
                                        United States District Judge